*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *REBECCA LOCKRIDGE,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 08-136-P-S* |
| | ) | |
| *UNIVERSITY OF MAINE SYSTEM,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

The defendant, the University of Maine system, moves for summary judgment on all claims asserted against it in this employment discrimination case. I recommend that the court grant the motion.

### I.  Summary Judgment Standards

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to

support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id*. The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id*. The movant then must respond to the nonmoving

2

party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Sánchez-Figueroa v. Banco Popular de Puerto Rico*, 527 F.3d 209, 213-14 (1st Cir. 2008).

## II.  Factual Background

The following undisputed material facts are appropriately presented in the parties' respective statements of material facts.

The University of Southern Maine ("USM") is one of seven universities within the defendant University of Maine System ("UMS"). Defendant's Statement of Material Facts in Support of Motion for Summary Judgment ("Defendant's SMF") (Docket No. 20) ¶ 1; Plaintiff's Response to Defendant's Statement of Material Facts ("Plaintiff's Responsive SMF") (Docket No. 29) ¶ 1. In 1984, the plaintiff, Rebecca Lockridge, was hired by USM in a tenure-track position as an assistant professor of communication. *Id.* ¶ 2. She was initially hired for a one-year term. *Id.* ¶ 3.

The plaintiff's April 25, 1984, letter of appointment required her to complete her Ph.D.

3

by September 1, 1985, as a condition of reappointment in the 1986-87 academic year.  *Id*. ¶ 4.  In January, 1985, the Peer Review Committee for the plaintiff's department unanimously recommended that she be reappointed for a one-year term.  *Id*. ¶ 5.  The committee was made up of all department faculty members, except those being reviewed.  *Id*. ¶ 6.  The function of the committee was to make recommendations regarding staffing, hiring, peer evaluation, tenure, and promotion of department faculty.  *Id*.

The dean, provost, and president concurred with the recommendation of the department's Peer Review Committee, and the plaintiff was reappointed on September 1, 1985, for another one-year term despite the fact that she had not completed her Ph.D. by that date as required in her appointment letter.  *Id*. ¶ 7.

When she arrived at USM in 1984, the plaintiff became good friends with Leonard Shedletsky, another professor in her department.  *Id*. ¶ 8.  On more than one occasion, the plaintiff was invited to Shedletsky's home, once or twice with her children and once with just Shedletsky and his wife.  *Id*. ¶ 8.  The plaintiff also invited Shedletsky to a party at her home for the whole department.  *Id*.

The plaintiff alleges that, during the summer of 1985, Shedletsky called her at home, said that his wife was out of town, and asked if he could come over.  *Id*. ¶ 9.[1]  She alleges that he told her that he was unsure of whom he loved although he knew he loved his daughter.  *Id*.  In response, the plaintiff told Shedletsky that that night was not a good time and asked him to come to dinner at her home two days later with her and her daughter.  *Id*.  The plaintiff alleges that, at around the same time, Shedletsky told her that he was planning to teach on the Gorham campus of USM for the fall semester of 1985 so that he and the plaintiff could spend more time together.

---

[1]  The plaintiff purports to qualify this paragraph of the defendant's statement of material facts, Plaintiff's Responsive SMF ¶ 9, but cites no authority for the qualification.  By the terms of Local Rule 56(f), therefore, the paragraph is deemed admitted to the extent that it is supported by the citation given by the defendant.

*Id.* ¶ 10.  The plaintiff viewed the two conversations as sexual overtures by Shedletsky.  *Id.* ¶ 11.
She does not allege that he made any sexually inappropriate comments or overtures at any other
time.  *Id.*  She does not allege that he ever touched her in a sexually inappropriate way.  *Id.* ¶ 13.

The plaintiff never reported the two allegedly sexually inappropriate conversations with
Shedletsky to anyone in authority at USM in 1985, 1986, or 1987.  *Id.* ¶ 14.  In 1988, the
plaintiff reported the telephone call and her concern that Shedletsky was treating her in a hostile
fashion to USM's Equal Opportunity Officer Nancy Kelleher.  *Id.* ¶ 15.[2]

The plaintiff is currently the only tenured female faculty member in her department, but
for 19 of the last 24 years, she was not the only tenured, or tenure-track, female faculty member
in the department.  *Id.* ¶¶ 17-18.  Currently, there are two other female faculty members in the
department, neither of whom is on a tenure-track appointment.  *Id.* ¶ 18.  When the plaintiff
started at USM, there were six faculty members in the department, three of whom were female.
*Id.* ¶ 19.  In 1987, another woman was hired as an assistant professor in the department; she was
tenured and promoted to associate professor in 1993 and remained a tenured member of the
faculty until her death in 2006.  *Id.* ¶ 20.  Between 1981 and 1987, four females were hired into
tenure-track positions in the department.  *Id.* ¶ 21.  One left before attaining tenure and one left
after seven years.  *Id.* ¶ 21.  Of the eight males hired by the department since 1987, three have
been granted tenure, four left before attaining tenure, and one is not yet eligible for tenure.  *Id.*
¶ 22.

In June 1985, Dean Robert Hatala granted the plaintiff time off for scholarship for the
spring semester of 1986.  *Id.* ¶ 23.  After receiving this award, the plaintiff conferred with

---

[2] Again, the plaintiff purports to qualify this paragraph of the defendant's statement of material facts, Plaintiff's
Responsive SMF ¶ 15, but cites no authority in support of that qualification.  Accordingly, the paragraph is deemed
admitted to the extent that it is supported by the citation given.  The same is true of the following paragraphs of the
plaintiff's responsive statement of material facts:  19, 22, 37-40, 58, 60, 64, 67, 71, 74-75, 77-78, 86, 88-89, 92, 103,
111, 114-17, 131-32.

Shedletsky, then chair of the department, to arrange her teaching assignments for the 1985-1986 academic year so that she could take advantage of the time off for scholarship. *Id*. Shedletsky did nothing to prevent the plaintiff from taking advantage of this award. *Id*. ¶ 24. The award was expressly made contingent on the plaintiff completing the full draft of her doctoral dissertation. *Id*. ¶ 25.[3] The plaintiff failed to complete her dissertation draft as Hatala had requested. *Id*.

In October 1985, the department's Peer Review Committee, which was chaired by Shedletsky, voted unanimously to recommend that the plaintiff be reappointed, despite her failure to complete her dissertation. *Id*. ¶ 26. The chair of the department, Russell Kivatisky, also recommended her to Hatala for reappointment. *Id*. ¶ 27. The decision to reappoint was later deferred until the spring of 1986 by Hatala, the provost, and the president, due to the lack of a completion date for the plaintiff's dissertation. *Id*. ¶ 28. In the spring of 1986, the Peer Review Committee again unanimously voted to reappoint the plaintiff for a two-year period. *Id*. ¶ 29. On June 10, 1986, the president reappointed the plaintiff for a two-year term effective September 1, 1986. *Id*. ¶ 30. By June 1986, the plaintiff still had not completed her dissertation. *Id*. ¶ 31.

In June 1987, the plaintiff received a summer faculty fellowship of $3,000. *Id*. ¶ 32. In July 1987, the plaintiff was given a performance award of $484.66 at the recommendation of the department. *Id*. ¶ 33. In November 1987, the plaintiff's proposal for faculty senate research funds was accepted, and she received $2,000 from the University to work on a book she was writing. *Id*. ¶ 34. In July 1988, the plaintiff received a performance award of $585, and an inequity adjustment of $2,000 was added to her salary. *Id*. ¶ 35.

---

[3] The plaintiff contends that, although she arranged for Professor Russell Kivatisky to take over her research methods class so that she could finish her dissertation, Shedletsky "summarily denied her request," presumably for Kivatisky to take over the class. Plaintiff's Statement of Additional Material Facts ("Plaintiff's SMF") (included in Plaintiff's Responsive SMF, beginning at 9) ¶¶ 10-12; Defendant's Response to Plaintiff's Statement of Additional Material Facts ("Defendant's Responsive SMF") (Docket No. 35) ¶¶ 10-12.

During the years from 1985 through 1989, the plaintiff was provided with faculty professional development assistance, which is funding for enhancing a faculty member's professional growth as well as release time from teaching to devote to scholarship. *Id*. ¶ 36. In September 1988, the plaintiff was again reappointed for a two-year term, even though she had not completed her dissertation and obtained her Ph.D. *Id*. ¶ 37. In April 1989, the Peer Review Committee voted to take no action on the plaintiff's appointment because she had not yet completed her Ph.D. or demonstrated her ability to produce additional scholarship before her consideration for tenure and promotion in the fall of 1989. *Id*. ¶ 38. In May or June 1989, the plaintiff completed her dissertation and received her Ph.D. *Id*. ¶ 39. Between her arrival at USM in 1984 and her application for tenure in 1989, the plaintiff published only one article in a juried or peer-reviewed journal. *Id*. ¶ 40.

In the fall of 1989, the plaintiff requested consideration for promotion and tenure. *Id*. ¶ 41. During the tenure process, a faculty member is evaluated in the areas of teaching, scholarship, and service to the University and the community. *Id*. When the plaintiff came under consideration for tenure, the Personnel Committee reviewing her application was made up of only the tenured professors in the department. *Id*. ¶ 42. As a result, the Personnel Committee consisted of two people, one of whom was Shedletsky. *Id*. In late October 1989, the two members of the committee met to discuss the plaintiff's application but were unable to come to agreement. *Id*. ¶ 43. Professor Kivatisky supported the application, while Shedletsky recommended that the plaintiff not be granted tenure. *Id*.

In January 1990, the dean, provost, and president also decided not to recommend the plaintiff for promotion and tenure. *Id*. ¶ 44. On March 7, 1990, the president wrote to the plaintiff, stating that the reason for her recommendation was that the plaintiff had "not by now

established a consistent pattern of peer reviewed publications." *Id.* ¶ 45.  On March 19, 1990, the plaintiff filed a union grievance with USM, which was eventually settled when she was recommended for tenure in the summer of 1990 because she submitted new materials not available at the time of her tenure review. *Id.* ¶ 46.  In the spring of 1990, the plaintiff also made a formal complaint with Sue Ellen Bordwell, the Director of Employment Services and Equal Employment Officer at USM.  *Id.* ¶ 47.  In her complaint, the plaintiff described the two conversations with Shedletsky in 1985 and Shedletsky's recommendation that she be denied tenure.  *Id.*  USM investigated and determined that the plaintiff's charges against Shedletsky were not valid.  *Id.*

In 1990, the plaintiff also filed a complaint against USM with the Maine Human Rights Commission, which she subsequently withdrew when she was recommended for tenure.  *Id.* ¶ 48.  In the summer of 1990, USM's president reconsidered the plaintiff's application for promotion and tenure and, based on the recent acceptance of an article written by the plaintiff for publication in a peer-reviewed journal, recommended tenure to the Board of Trustees.  *Id.* ¶ 49. The plaintiff was granted tenure and promoted to associate professor effective September 1, 1990. *Id.* ¶ 50.

In July 1990, the plaintiff was given an inequity adjustment of $650 to her salary.  *Id.* ¶ 51.  In December 1990, the plaintiff applied for a sabbatical, which was approved by the department chair, Shedletsky.  *Id.* ¶ 52.  The plaintiff was granted and took a sabbatical with full pay from September 1991 through December 1991.  *Id.*  She did not produce any publication as a result of this sabbatical.  *Id.*  In April 1991, the Faculty Senate Research Committee approved a $2,000 stipend for the plaintiff to conduct research.  *Id.* ¶ 53.

In September 1992, the plaintiff became chair of the department.  *Id.* ¶ 54.  She alleges

that, in 1993, Shedletsky asked the dean to send an outside observer to a department meeting during which the possibility of the plaintiff's removal as chair of the department was to be discussed. *Id.* ¶ 55.  In May 1993, at the dean's request, Judy Tizon, a member of the Anthropology Department, attended the meeting concerning the plaintiff's possible removal as chair of the department. *Id.* ¶ 56.  As a result of that meeting, the plaintiff was removed from her position as chair by a vote of the department. *Id.* ¶ 57.  The dean accepted the department's recommendation based on his conclusion that the "Department had lost confidence in [her] ability to represent its interests." *Id.* ¶ 57.

In 1994, the Peer Review Committee reviewed the plaintiff's academic portfolio and gave her a positive evaluation, in part because of her recent publication of an article in a peer-reviewed journal. *Id.* ¶ 58.  In February 1998, the plaintiff's request for a sabbatical was denied by USM's president because she never finished the manuscript from her previous sabbatical leave in the fall of 1991 and had failed to produce any evidence that her new project would be completed. *Id.* ¶ 59.  In October 1999, the dean recognized the plaintiff for her efforts on a book about mother/daughter communication. *Id.* ¶ 60.  This book has never been published. *Id.*

In the fall of 2000, the dean approved a request from Kivatisky, then the department chair, to give the plaintiff a course release for scholarship in the spring of 2001[4] to work on her mother/daughter communication book. *Id.* ¶ 61.  In 2000, the plaintiff applied for a sabbatical, with the department's approval, but the provost denied her request. *Id* ¶ 62.

In 2003 or 2004, USM decided to combine the faculties of the Department of Communications and the Media Studies program, creating the Department of Communication and Media Studies ("CMS"). *Id.* ¶ 63.  As part of this process, faculty members from the

---

[4] This paragraph of the defendant's statement of material facts indicates the year "2000," Defendant's SMF ¶ 61, but I assume that is a typographical error.

Department of Communications were moved from the Gorham campus of USM to its Portland campus. *Id.* At the time of the move, there were only two vacant offices in the department's Chamberlain Street building. *Id.* ¶ 64. These offices were given to the department chair and the most senior member of the department faculty, Kivatisky. *Id.* The plaintiff and Shedletsky were moved to a nearby building on Bedford Street. *Id.*

In 2004, the plaintiff's request to take a sabbatical in the spring of 2005 was granted. *Id.* ¶ 65. The plaintiff did not publish any book or peer-reviewed article as a result of the sabbatical, despite the provost's statement that he expected significant accomplishments during the sabbatical. *Id.* In the spring of 2004, the plaintiff's request for a joint appointment to her department and the Women's Studies Program, effective September 1, 2005, was approved by her department and the dean. *Id.* ¶ 66.

In February 2006, the plaintiff met with Dean Devinder Malhotra and complained that department meetings were stressful and were making her ill. *Id.* ¶ 67. She asked to be excused from future department meetings. *Id.* The dean told her that attending faculty meetings was part of her responsibility as a faculty member and that she should report any inappropriate incidents that occurred during those meetings to him. *Id.* The plaintiff stopped attending department meetings in the spring of 2006. *Id.*

In 2006, the plaintiff was scheduled for a post-tenure review for the academic year 2005-2006. *Id.* ¶ 69. This is a performance review of tenured members of the faculty, which is done every four years or as necessary. *Id.* In April 2006, the Peer Review Committee met with the plaintiff for her presentation regarding her post-tenure review. *Id.* ¶ 70. The members of the Peer Review Committee were Kivatisky, Shedletsky, Richard West, Daniel Panici, David Pierson, and Matthew Killmeier. *Id.* ¶ 71. Pierson and Killmeier were not voting members. *Id.*

10

The Peer Review Committee evaluated the plaintiff on scholarship, service, and teaching, giving her a recommendation of satisfactory or unsatisfactory in each category. *Id*. ¶ 72. Faculty members who receive a satisfactory review from the Peer Review Committee, and subsequently from academic administrators, are eligible to receive an individual salary increase. *Id*.

At the time the plaintiff made her presentation to the Peer Review Committee in 2006, she had not published a book or a juried or peer-reviewed article since 1994. *Id*. ¶ 73. One of the works in progress listed in the materials the plaintiff presented to the Peer Review Committee was the book on mother/daughter communication which had been in progress for many years. *Id*. ¶ 74. The plaintiff's *vita* shows that over her 24 years at USM, she has published two essays in books, two journal articles, an essay in a museum newsletter, an essay in a museum brochure, and two articles in the student newspaper. *Id*. ¶ 75. In the area of scholarship, the committee gave the plaintiff a rating of unsatisfactory. *Id*. ¶ 73.

In the area of teaching, the plaintiff was also given an unsatisfactory rating by the Peer Review Committee. *Id*. ¶ 76. Although a large number of the plaintiff's student evaluations were missing from the materials she submitted, the committee evaluated her teaching based on the information that had been included. *Id*. ¶ 77. The committee found that the plaintiff's scores in the available evaluations were consistently in the "average" range of teaching effectiveness. *Id*. The committee was concerned that the plaintiff did not provide a complete teaching portfolio and that the "available data demonstrates that Professor Lockridge's teaching requires a great deal of improvement to achieve a satisfactory recommendation." *Id*.

The committee found the plaintiff's service activities to be insufficient for a senior-level colleague based on the fact that she included only two service activities related to the department in her materials and presentation, she did not mention any outside service activities in her

discipline, and the majority of her activities were partisan political activities. *Id*. ¶ 78. She also included some service activities related to the Women's Studies Program. *Id*. ¶ 79. The committee found these activities admirable, but not supportive of the functioning of the curriculum, faculty development, or student advising in the department. *Id*. ¶ 79.

On April 14, 2006, the Peer Review Committee notified the plaintiff that her performance over the previous four years was found to be unsatisfactory in all three areas, scholarship, service, and teaching. *Id*. ¶ 80. On April 26, 2006, the plaintiff wrote to Dean Malhotra questioning whether there was some degree of gender bias involved in the committee's review. *Id*. ¶ 81. After receiving the letter, Malhotra met with the plaintiff to discuss her post-tenure review and advised her to contact USM's Executive Director of Campus Diversity and Equity, Kathleen Roberts. *Id*. ¶ 82. In mid-June 2006, the plaintiff met with Roberts to discuss her allegations of a hostile environment in her department. *Id*. ¶ 83.

On June 28, 2006, Dean Malhotra sent his recommendation regarding the plaintiff's post-tenure review to the provost, in which he disagreed with the committee's determination that her academic and service work outside of her department was not relevant to the evaluation of her work. *Id*. ¶¶ 84-85. Based on his own academic judgment, Dean Malhotra found the plaintiff's service to be satisfactory, her teaching average, and her scholarship unsatisfactory. *Id*. ¶ 86. His overall evaluation of her performance was unsatisfactory, "primarily on the basis of her inadequate scholarly record." *Id*. ¶ 87. As a result of this evaluation, the plaintiff did not receive an individual salary increase. *Id*.

On August 16, 2006, the plaintiff met again with Roberts about her complaints of a hostile environment in her department. *Id*. ¶ 88. In preparation for this meeting, the plaintiff compiled a list of all the incidents since the beginning of her employment at USM that she

believed constituted a hostile work environment in the department. *Id*. Roberts explained the complaint process to the plaintiff, who chose not to file either a formal or informal complaint with USM's EEO [Equal Employment Opportunity] Office. *Id*.

On October 31, 2006, the plaintiff again met with Roberts. *Id*. ¶ 90. Roberts discussed with the plaintiff the possibility of having a neutral observer at department meetings to insure a civil environment. *Id*. The plaintiff declined Roberts' offer to provide a neutral observer. *Id*. The plaintiff sent the following e-mail to Roberts on November 17, 2006:

> As I understand your position from our Tuesday October 31 meeting, the direction my requests take is now up to me. I want to spend more time assessing the situation and will contact you when I feel more certain about my options.

*Id*. ¶ 91.

The plaintiff filed a complaint with the Maine Human Rights Commission on December 20, 2006. *Id*. ¶ 92. She was concerned that her time period for filing such a complaint was passing and her complaint would be time-barred. Plaintiff's SMF ¶ 44; Defendant's Responsive SMF ¶ 44. No action was taken by the agency within 180 days, and a right-to-sue letter was issued. Defendant's SMF ¶ 93; Plaintiff's Responsive SMF ¶ 93.

The plaintiff contends that all of the tenured males in the department received at least the 3.5 percent contract raise during the same post-tenure review process, including Kivatisky, who, she alleges, has published less frequently than she. *Id*. ¶ 96. At the time of Kivatisky's post-tenure review, he was on a "four-four load" which means that he taught 12-load credits a semester, which is considered a full-time load. *Id*. ¶ 97. He was also on a non-scholarly track and therefore scholarship did not play any role in the evaluation performed during the post-tenure review. *Id*. Nonetheless, Kivatisky's *vita* submitted at the time of his review reveals that he had published three times between 1993 and 1998. *Id*. ¶ 98.

The plaintiff was removed as chair of the department in May 1993 by a 5-1 vote of the department faculty, and she alleges that on that day she received in her mailbox a copy of the article "Accused of Sexual Harassment," written by Shedletsky.  *Id*. ¶¶ 106, 108.  The article was published in a 1993 collection of articles and concerns the sexual harassment complaint the plaintiff filed against Shedletsin in 1990, but does not mention her by name.  *Id*. ¶ 108.  In the article, Shedletsky stated that the accusations against him were laughable and that the university's lawyer and EEO officer had laughed at the allegations.  Plaintiff's SMF ¶¶ 15-16; defendant's Responsive SMF ¶¶ 15-16.  He also said that his accuser's work did not meet the academic standards of the university.  *Id*. ¶ 14.

The plaintiff claims that she was not invited by Department Chair Kathryn Lasky in 1993 to be part of the plans to establish a separate media studies program, and none of her courses were offered in the program.  Defendant's SMF ¶ 109; Plaintiff's Responsive SMF ¶ 109.  In December 1997, Department Chair West cancelled the telephone card with which she had been provided for long-distance telephone calls for work.  *Id*. ¶ 110.  Before the card was cancelled, the plaintiff received notice from West that she had exceeded her yearly budget for long-distance calls, and that he had suspended her long-distance telephone card effective immediately.  *Id*. ¶ 111.  When the plaintiff complained to the dean about the cancellation of her telephone card, the dean authorized reimbursement to her in the amount of $150 from the dean's account for certain work-related calls.  *Id*. ¶ 112.

The plaintiff alleges that, when she requested a new printer, Department Chair West left her an "angry voicemail" in response telling her to "buy it yourself."  *Id*. ¶ 113.  She alleges that, during the 1990s, Department Chairs West and Lasky denied her requests for a new computer for her office.  *Id*. ¶ 114.  Although she was told by West and Lasky that "there was not enough

money in the budget for it," she claims that none of the male faculty members of the department have had their requests for office equipment denied. *Id.* In 1998, USM bought a new computer for her, which the plaintiff used at home, and provided her with a used computer for her office. *Id*. ¶ 115. In early June 2006, USM bought a new computer and printer for the plaintiff's office. *Id*. ¶ 116.

The plaintiff's requests for sabbatical leave in 1998 and 2001 were denied by USM administrators; she claims that no male faculty member has ever had his request for sabbatical leave denied, but admits that she has no direct knowledge on this point. *Id*. ¶ 117. She was granted a sabbatical in 2005, but alleges that in order to obtain it, she was required to submit certain materials that were not required of her male colleagues. *Id*. ¶ 118.

The plaintiff alleges that during a department meeting in 2004 to discuss her request for a joint appointment with Women's Studies, she was subjected to hostile questioning by members of the department. *Id*. ¶ 119. As an example, she alleges that Panici, chairing the meeting, asked whether she would still be doing student advising for the department. *Id.* She asserts that West called her "condescending" when she suggested that other faculty members could cover the teaching of her courses during her 2005 sabbatical. *Id*. ¶ 120. She alleges that West, on another occasion, said that he "couldn't stand her." *Id*. ¶ 121.

According to the plaintiff, Department Chair Panici told her that she was not allowed in the department office due to a problem she had with the staff. *Id*. ¶ 122. She says that she was "continually excluded" from the department office. *Id.* The plaintiff claims that she was subjected to a repeated pattern of offensive jokes about sex and sexuality made by West from 1991 through 2006. *Id*. ¶ 123. The plaintiff says that she and Lasky heard West state in 1991 that he was "blessed to have such a wonderful penis" and that "God has been very good to me."

15

*Id.* ¶ 124.  She thinks that she may have heard West say something similar another time in the 1990s.  *Id.*

The plaintiff overheard West tell a male student, who admired a female professor, that, if he liked her, he should get in line because, although she was married, she liked girls.  *Id.* ¶ 125.  This comment was not directed at the plaintiff.  *Id.*  In 1992-1993, the plaintiff called West's home telephone number and claims that the message on his answering machine was, "I am not home right now, but I have a big and beautiful organ to share with you, leave your name and phone number."  *Id.* ¶ 126.  The plaintiff, who was department chair at the time, was concerned that this message was inappropriate for students who might call West at home.  *Id.*

At a department meeting in 2004, when the plaintiff and six male professors were discussing a potential candidate for chair who had published a book of photography about the Grand Canyon, West stated that the Grand Canyon had special meaning for him as a gay male.  *Id.* ¶ 127.  The plaintiff found the comment inappropriate, but all of the male professors laughed.  *Id.*  The plaintiff stated, "We need more women in this department," to which she claims Kivatisky replied, "We have too many now."  *Id.*     In the fall of 2005, at a department meeting at which the plaintiff and five male professors were present, West stated that he and his friends had seen the film "Brokeback Mountain" and then "of course we had to go do something about it afterward."  *Id.* ¶ 128.  In the spring of 2006, in a department meeting, the plaintiff asserts that West stated to Kivatisky, "Russ, you and you are not gay."  *Id.* ¶ 129.  There may have been another word in this statement that the plaintiff cannot recall.  *Id.*  She was offended by the repeated sexual comments by West, but did not report them as she did not wish to upset the members of the department.  Plaintiff's SMF ¶ 13; Defendant's Responsive SMF ¶ 13.  Sherrie Kaminsky has filed a formal complaint alleging that West's comments created a hostile work

environment. *Id*. ¶ 35.

In October 2006, the plaintiff claims that she was not allowed to participate in the department's decision to recommend Pierson for tenure when she did not attend the meeting at which the vote was held. Defendant's SMF ¶ 131; Plaintiff's Responsive SMF ¶ 131. Also in that month, the plaintiff claims, she was not permitted to attend a meeting of the department's Curriculum Committee, of which she was not a member. *Id*. ¶ 132.

In 2007 and 2008, the plaintiff's requests for an office at 19 Chamberlain Street, where other department faculty members were located, were denied, and a female faculty member junior to the plaintiff was given an office in the Chamberlain Street building. *Id*. ¶ 133. Kivatisky, the department chair, responded to the plaintiff's written request for the office that "Given the continuing legal issues, I want to be particularly sensitive to the climate in the office and the staff." Plaintiff's SMF ¶ 25; Defendant's Responsive SMF ¶ 25. He went on, "Some find your attitude toward them to be demeaning. They find this ironic given your feminist stance." *Id*. Faculty members without offices at 19 Chamberlain Street, where the department's administrative staff is located, have little to no administrative support, requiring them to do their own filing, copying, and typing. *Id*. ¶¶ 26-27.

The plaintiff was given an office in the History Department at 98 Bedford Street. *Id*. ¶ 30. Due to a mold infestation, the plaintiff had to move from this office. *Id*. ¶ 31. She was moved to the Women's Studies Department at 92 Bedford Street. *Id*. ¶ 33.

The plaintiff alleges that Kivatisky sent her a "hostile" e-mail in 2008 about her treatment of the staff and negative feedback surrounding her advising. Defendant's SMF ¶ 135; Plaintiff's Responsive SMF ¶ 135. She claims that her name was left off a department e-mail list in September 2008 by a female administrative assistant. *Id*. ¶ 136. At that time, the administrative

assistant sent out an e-mail to the department and either mistyped the plaintiff's name or forgot to include her name.  *Id*. ¶ 137.  The chair realized that the plaintiff's name had been omitted, and the mistake was corrected.  *Id*.  The administrative assistant never intentionally left the plaintiff's name out of an e-mail she sent to the department and no one ever asked her to do so. *Id*. ¶ 138.[5]

From the time of her post-tenure review in 2006 through November 6, 2008, the plaintiff did not publish a book or a juried or peer-reviewed article.  *Id.* ¶ 140.

On May 9, 2007, the department's Peer Review Committee met for a post-tenure review of Kivatisky.  Plaintiff's SMF ¶ 2; Defendant's Responsive SMF ¶ 2.  Kivatisky was given a satisfactory rating in all three performance areas, including scholarship.  *Id*. ¶ 3.  In his submission to the committee, Kivatisky claimed that he was pursuing two avenues of scholarship:  a paper suggesting that professors use an "Interactive Synecology" to build ecological simulations and "a textual analysis on the public discourse surrounding Plum Creek Timber Company's attempt to develop land around Moosehead Lake."  *Id*. ¶ 4.  Kivatisky had published less frequently than the plaintiff had.  *Id*. ¶ 3.

### III. Discussion

The complaint in this action alleges that the plaintiff was harmed by a hostile work environment based on sexual harassment under federal and state law, Second Amended Complaint ("Complaint") (Exhibit D to Docket No. 1), Counts I & II; gender discrimination under federal and state law, *id*. Counts III & IV; unlawful retaliation under federal and state law, *id*. Counts V & VI; and a policy or custom of inadequately training or supervising its EEO

---

[5] The plaintiff purports to deny this paragraph of the defendant's statement of material facts, but the denial is not supported by a citation to the summary judgment record, Plaintiff's Responsive SMF ¶ 138, and the paragraph is therefore deemed admitted to the extent that it is supported by the citation to the summary judgment record given by the defendant.

officers to review and investigate complaints of sexual harassment, sexual discrimination, and unlawful retaliation, *id.*  Count VII.

## A.  Counts I & II

Counts I and II allege liability for a hostile work environment.  Complaint ¶¶ 72-93. These claims are based on 42 U.S.C. § 2000e-5(f) and 5 M.R.S.A. § 4613, respectively.

In order to establish a *prima facie* claim of hostile work environment under the federal statute,[6] the plaintiff must present facts to demonstrate the following:

> (1) that she . . . is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Berry*, 525 F.Supp.2d at 230 (quoting *O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir. 2001)).

### *1.  Statute of Limitations*

Before considering whether the plaintiff has established all of these elements in a manner sufficient to avoid summary judgment, however, it is necessary to consider the defendant's first argument: that these claims are time-barred.  Defendant's Motion for Summary Judgment ("Motion") (Docket No. 19) at 3-8.  Before she may bring a Title VII claim to court, a plaintiff must file a charge with the Equal Employment Opportunity Commission within 180 days "after

---

[6] The Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq*., provides protections similar to those created by the federal statute against discrimination based on sex.  Maine courts have relied on federal case law construing the federal statute (sometimes referred to as "Title VII") to construe and apply the provisions of the Maine Human Rights Act.  This court has accordingly applied the same legal standard in considering whether a case such as this survives summary judgment under both federal and state law.  *Berry v. City of South Portland*, 525 F.Supp.2d 214, 227 (D. Me. 2007).

the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  Because Maine has its own anti-discrimination laws and enforcement agency, the period is extended to 300 days after the alleged wrongful act for actions initially instituted with the state agency.  42 U.S.C. § 2000e-5(e); *Lakshman v. University of Maine Sys.*, 328 F.Supp.2d 92, 101 (D. Me. 2004).

In this case, the plaintiff filed her charge of discrimination with the Maine Human Rights Commission on December 20, 2006.  Defendant's SMF ¶ 92; Plaintiff's Responsive SMF ¶ 92. She initiated this action in state court on February 26, 2008, prior to its removal to this court. Docket Record, *Lockridge v. Pattenaude*, Superior Court (Cumberland County), Docket No. CV 08-115 (Exhibit F to Notice of Removal (Docket No. 1)), at [1].  "A plaintiff who brings a hostile work environment claim under Title VII must file her claim within 300 days of an act of discrimination, and in general cannot litigate claims based on conduct falling outside of that period."  *O'Rourke*, 235 F.3d at 730.  An exception to this rule is provided by the continuing violation doctrine, "an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims."  *Id*. (citation and internal quotation marks omitted).  *See also Lakshman*, 328 F.Supp.2d at 102 n.16.

The plaintiff in the instant case relies on the continuing violation doctrine.  Plaintiff's Response to Defendant's Motion for Summary Judgment ("Opposition") (Docket No. 28) at 26-27.[7]  Without specifying the applicable deadline date for either claim, the plaintiff asserts that her hostile work environment claims are "anchored . . . within the statutory time period" by the unsatisfactory scholarship rating she received in her post-tenure peer review and the "retaliatory"

---

[7] For future reference, counsel are advised that use of the @ sign is not an acceptable citation format.

exclusion from her department's offices "based on the fact that [she] filed a complaint for gender discrimination." *Id*. at 27.

The defendant identifies the applicable deadline date for the federal claim as February 22, 2006 (December 20, 2006, minus 300 days).  Motion at 4.  The plaintiff does not challenge this calculation, and I will therefore use it in my analysis.[8]  The statute of limitations for the state-law claim specifies a period of two years "after the act of unlawful discrimination complained of."  4 M.R.S.A. § 4613(2)(C).  Thus, the start of the two-year window for the state-law claim is February 26, 2006, or two years prior to the initiation of this action.

The plaintiff received an unsatisfactory scholarship rating from the Peer Review Committee on April 14, 2006, Defendant's SMF ¶ 80; Plaintiff's Responsive SMF ¶ 80, and from Dean Malhotra on June 28, 2006, *id*. ¶¶ 84, 86.  Either event is within the limitations periods for both claims.  The date of the "retaliatory" exclusion from the department's offices is more difficult to pin down, but the plaintiff apparently places this event or events in 2007 or 2008.  Plaintiff's SMF ¶¶ 23-25, 32, 45; Defendant's SMF ¶ 133.  Those years are also within the limitations periods for both claims.

The First Circuit has identified several criteria to be used in determining the sufficiency of a serial continuing violation claim.  They are:

> 1) is the *subject matter* of the discriminatory acts sufficiently similar that there is a substantial relationship between the otherwise untimely acts and the timely acts?
> 2) are the acts isolated and discrete or do they occur with *frequency* or repetitively or continuously?
> 3) are the acts of *sufficient permanence* that they should trigger an awareness of the need to assert one's rights?

*O'Rourke*, 235 F.3d at 731 (emphasis in original; citations omitted).

---

[8] By my calculation, the applicable deadline should be February 23, 2006, but the one-day difference has no bearing on the substance of my analysis.

The plaintiff identifies the following incidents which would otherwise be time-barred as meeting all of these criteria in a manner that will allow her to proceed with these claims:

> recommendation against tenure after rejection of sexual overtures, an article placed in faculty mailbox discussing false sexual harassment claims after Plaintiff's removal from Chair of the Department and repeated discussions by a member of the male fa[c]ulty of his sexual organs and sex-life. Those events must be viewed in the aggregate with the "work sabotage, exclusion, denial of support and humiliation" as recited in the Facts and incorporated herein, suffered by Professor Lockridge during her tenure within the Department.

Opposition at 27-28. This global approach makes the analysis somewhat more difficult.

*a. Specifically mentioned events: sexual overtures*

"Recommendation against tenure after rejection of sexual overtures" is an apparent reference to what the plaintiff perceived as two sexual overtures by Shedletsky in 1985, Defendant's SMF ¶¶ 9-11, and his recommendation in 1989 that the plaintiff not be granted tenure, *id*. ¶ 43, after the Peer Review Committee, which he chaired, twice voted unanimously to recommend her reappointment to the faculty, *id*. ¶¶ 26, 29. Assuming *arguendo* that it is reasonable to infer that Shedletsky's 1989 recommendation resulted from the plaintiff's rejection of what she perceived as his sexual overtures in 1985, the *subject matter* of that combination of events does not appear similar to the plaintiff's physical "exclusion" from an office in the building occupied by her department's administrative offices. As to Shedletsky's involvement, the 1985 and 1989 events appear isolated and discrete from the two timely incidents or events, as there is no evidence that he was involved in the decision not to give the plaintiff the office she desired, *see* Plaintiff's SMF ¶ 25, and Shedletsky was only one of six members of the 2006 Peer Review Committee, and one of four voting members of that group, that gave the plaintiff an unsatisfactory rating in her post-tenure review, Defendant's SMF ¶¶ 71, 80.

In addition, the 1985 and 1989 incidents founder on the third *O'Rourke* criterion,

awareness of the need to assert one's rights. The evidence establishes that the plaintiff believed at the time that she was being discriminated against. In response to the negative tenure recommendations, she filed a union grievance on March 19, 1990. Defendant's SMF ¶ 46; Plaintiff's Responsive SMF ¶ 46. In the spring of 1990, she also made a formal complaint to the USM EEO Officer, describing the two 1985 conversations with Shedletsky and his recommendation that she be denied tenure. *Id*. ¶ 47. She also filed a complaint with the Maine Human Rights Commission. *Id*. ¶ 48. She withdrew this complaint when she was recommended for tenure. *Id*. "A knowing plaintiff has an obligation to file promptly or lose [her] claim." *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 402 (1st Cir. 1990). "A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the [300] day limitation period." *Id*. (citation omitted). That is precisely what the plaintiff presents in this case with respect to the allegations about Shedletsky's actions in 1985 and 1989.

b. *Specifically mentioned events: the magazine article*

After reading a magazine article written by Shedletsky that was placed in the plaintiff's departmental mailbox on the day that she was removed from the position of chair of the department in 1993, Defendant's SMF ¶¶ 56-57, 108; Plaintiff's Responsive SMF ¶¶ 56-57, 108 -- the second specific incident mentioned by the plaintiff -- the plaintiff "was convinced her removal from the Chair of the Department was a direct result of her having filed a complaint against Professor Shedletsky previously." Plaintiff's SMF ¶ 18. Yet she did nothing to assert her rights with respect to this event, again running afoul of the third *O'Rourke* criterion. This also appears to have been an isolated and discrete act, independent of the others of which the plaintiff now complains. In addition, it seems anomalous that the defendant would permit the

23

plaintiff to become chair of the department in 1992 in the first place, Defendant's SMF ¶ 54; Plaintiff's Responsive SMF ¶ 54, well after the filing of her complaint in 1990.  If the defendant wished to retaliate against her for the filing of that complaint, the defendant would not be expected instead to wait until May 1993 to remove her as department chair.  *Id*. ¶¶ 56-57.

*c.  Specifically mentioned events: repeated discussions by West of his sexual organs and sex-life*

The following are the instances of alleged "discussions" by West of his sexual organs or sex life included in the summary judgment record:

1)  in 1991, the plaintiff claims that she and Lasky heard West state that he was "blessed to have such a wonderful penis" and that "God has been very good to me."  *Id*. ¶ 124.  She may have heard him say something similar on one other occasion in the 1990s.  *Id*.

2)  at an unspecified time, the plaintiff overheard West tell a male student who admired a female professor, "that if he liked her, he should get in line because although she was married, she likes girls."  *Id*. ¶ 125.

3)  in 1992-1993, while she was chair of the department, the plaintiff called West's home telephone and claims that the message on his answering machine was, "I am not home right now, but I have a big and beautiful organ to share with you, leave your name and phone number."  *Id*. ¶ 126.

4)  in 2004, at a department meeting, when the faculty was discussing a potential candidate for chair of the department who had published a book of photography about the Grand Canyon, West stated that the Grand Canyon has special meaning for him as a gay male.  *Id*. ¶ 127.

5)  in the fall of 2005, at a department meeting, West stated that he and his friends had seen the film "Brokeback Mountain" and then "of course we had to go do something about it

24

afterward." *Id.* ¶ 128.

6) in the spring of 2006, at a department meeting, the plaintiff claims that West said to Kivatisky, "Russ, you and you are not gay." *Id.* ¶ 129.[9]

The plaintiff cannot identify any other comments by West that she found offensive. *Id.* ¶ 130.

In addition to the fact that there is an 11-year gap between the first three of these remarks and the last three, there is no way, even when the allegations are interpreted with the benefit of all reasonable inferences in the plaintiff's favor (as required in connection with a defendant's motion for summary judgment), that the subject matter of any of the alleged remarks is sufficiently similar to the subject matter of (1) the timely finding that the plaintiff's post-tenure scholarship was unsatisfactory or (2) the timely denial of the plaintiff's request for a particular office space. Thus, there is an insufficient relationship between the otherwise untimely acts and the timely acts. The six alleged instances where West mentioned his sexual organs and sex life – if indeed item 2 on this list can accurately be characterized as such – over a period of 15 years,[10] 1991-2006, cannot satisfy the first *O'Rourke* criterion, that the subject matter of the discriminatory acts be sufficiently similar that there is a substantial relationship between the otherwise untimely acts and the timely acts.

It is also unlikely that these allegations could survive application of the third *O'Rourke*

---

[9] The plaintiff has not argued that this event was timely for either her federal or her state claim.

[10] The plaintiff asserts that "the incidents which prove the claim" of a hostile work environment "will necessarily occur over time" and cites cases involving spans of five, two-and-a-half, and four years. Opposition at 26. She cites no cases validating the considerably longer spans of approximately 15 years involved in this case, and my research has located none. *But see, e.g., Barrow v. Georgia Pacific Corp.*, 144 Fed.Appx. 54, 2005 WL 1926420 (11th Cir. Aug. 12, 2005), at 57-58, **2-**3 (ten events constituting "isolated, sporadic instances of racial harassment over . . . more than fourteen years" insufficient to overcome motion for summary judgment on hostile work environment claim); *Garcia v. New York City Admin. of Children's Servs.*, 2007 WL 2822153 (S.D.N.Y. Sept. 27, 2007), at *1-*2, *7 (seven alleged instances, some of which involved multiple offensive utterances, over 16 years insufficient to demonstrate hostile work environment); *Diggs v. Town of Manchester*, 303 F.Supp.2d 163, 171, 180-82 (D. Conn. 2004) (barrage of racially-based comments made more than 15 years before filing of charge of discrimination, along with incidents in 1988, 1994, and approximately 1996, too remote and/or isolated and sporadic to create hostile work environment alleged in complaint filed in 2000).

criterion, the plaintiff's awareness of the need to assert her rights, as the plaintiff admits that she did not report these comments "as she did not wish to upset the members of the Department." Plaintiff's SMF ¶ 13.  This only confirms that she was aware of the need to assert her rights in connection with the comments she found offensive.

*d.  All other factual allegations, incorporated by reference.*

As best as I can discern, the plaintiff alleges that the following events all form part of her hostile work environment claim, Opposition at 5-13.  I include only those factual allegations properly supported in the summary judgment record:

1)  In 1985, the plaintiff arranged for Kivatisky to take over her teaching responsibilities for a research methods class because she did not have time simultaneously to complete her dissertation and prepare to teach a new class.  Plaintiff's SMF ¶¶ 10, 12.  Shedletsky, then chair of the department, "summarily denied her request."  *Id*. ¶ 12; Defendant's Responsive SMF ¶ 12.[11]

2)   In 1987, she encountered a problem ordering video equipment.  Defendant's SMF ¶ 101; Plaintiff's Responsive SMF ¶ 101.

3)   After the plaintiff became chair of the department in September 1992, Shedletsky made it impossible for her to meet her responsibilities by declining to teach a backlogged course, refusing to allow more than the enrolled number of students into his courses, hindering a grant opportunity for the department so that he could file for it himself, and hanging up on her when she called him at home to discuss some of these issues.  Defendant's SMF ¶¶ 54, 103; Plaintiff's Responsive SMF ¶¶ 54, 103.  Shedletsky also refused to keep regular office hours, although he

---

[11] The plaintiff makes another assertion about 1985 in her opposition, but that assertion, that Shedletsky denied her request to teach courses in other programs, Opposition at 5, is not supported in the summary judgment record. Citation in a memorandum of law to an affidavit rather than or in addition to a specific paragraph in a party's statement of material facts is not appropriate under this court's Local Rule 56(f).

also did not do so before the plaintiff became chair.  *Id.* ¶ 103.

4)  In 1993, Lasky, then department chair, did not invite the plaintiff to be part of the plans to establish a separate media studies program.  *Id.* ¶ 109.

5)  During the 1990s, department chairs West and Lasky denied the plaintiff's requests for a new computer for her office.  *Id.* ¶ 114.  Although the chairs told her that there was not enough money in the budget for a new computer, she claims that none of the male faculty members in the department have had their requests for office equipment denied.  *Id.*

6)  In 1997, West, who was then department chair, abruptly cancelled the plaintiff's telephone card that had been provided for long-distance calls for work.  *Id.* ¶ 110.  The plaintiff admits that, before the card was cancelled, she had received notice from West that she had exceeded her yearly budget for long-distance calls and that he had suspended her long-distance phone card effective immediately.  *Id.* ¶ 111.[12]

7)  In 1998 and 2001, the plaintiff's requests for sabbaticals were denied.  Defendant's SMF ¶ 117.  Kivatisky has had two sabbaticals and produced some research after one of them. Plaintiff's SMF ¶ 21; Defendant's Responsive SMF ¶ 21.[13]  The current chair of the department has never been denied a sabbatical and is not aware of any other member of the department who

---

[12] The plaintiff also asserts that she "believes no male members of the department ever had their telephone card cancelled." Plaintiff's SMF ¶20 (cited in Opposition at 8).  The defendant objects to this paragraph of the plaintiff's statement of material facts and asks the court to strike it because "there is no record citation provided to support Lockridge's 'belief.'  This is supposition, not fact."  Defendant's Responsive SMF ¶ 20.  Paragraph 20 of the plaintiff's statement of material facts cites "Exhibit One, Affidavit of Rebecca Lockridge ¶ 12."  I assume that this is a reference to the plaintiff's affidavit and not to Exhibit One to that affidavit.  That paragraph states, in relevant part: "I believe no male members of the department ever had their telephone card cancelled."  Affidavit of Rebecca Lockridge ("Plaintiff's Aff.") (Attachment 1 to Plaintiff's Responsive SMF) ¶ 12.  The defendant's objection to this assertion is well-taken.  Rule 56(e) of the Federal Rules of Civil Procedure provides that an affidavit opposing summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  The quoted sentence from the plaintiff's affidavit meets none of these requirements and is hereby stricken.

[13] The relevant portion of paragraph 21 of the plaintiff's statement of material facts asserts: "Professor Kivatisky has had two sabbaticals, though he has not published anything as a result."  Plaintiff's SMF ¶ 21.  The defendant's response points out, correctly, Defendant's Responsive SMF ¶ 21, that the deposition testimony cited by the plaintiff as support for this assertion is actually that Kivatisky "probably" had two sabbaticals and that "[h]e did some stuff on one."  Deposition of Leonard Shedletsky (Attachment 4 to Docket No. 29) at 72.

has been denied a sabbatical.  *Id*. ¶ 22.

8)  The plaintiff was told by Panici, then the department chair, in 2006 that she was not allowed in the department's office due to a problem that she had with the staff.  *Id*. ¶ 122.[14]

9)  In October 2006, the plaintiff was not allowed to participate in the department's decision to recommended David Pierson for tenure after she had attended the Peer Review Committee meeting on this issue.  *Id*. ¶ 131; Plaintiff's SMF 37.[15]  She sent her vote in an envelope and, although the department had previously allowed male faculty members to vote in this manner when they had attended the meeting of the Peer Review Committee on an applicant for tenure, her vote was not accepted.  Plaintiff's SMF ¶ 37.

10)[16]  After the plaintiff filed her complaint with the Maine Human Rights Commission on December 20, 2006, her request for specific office space within the department was denied by the chair, Kivatisky, who stated in a message explaining his denial, *inter alia*, that "[g]iven the continuing legal issues, I want to be particularly sensitive to the climate in the office and the staff."  *Id*. ¶ 25; Defendant's Responsive SMF ¶ 25; Defendant's SMF ¶ 92; Plaintiff's Responsive SMF ¶ 92.  The plaintiff's name was left off a department e-mail list by an administrative assistant.  *Id.* ¶ 136.  In 2008, Kivatisky sent the plaintiff an e-mail, which she characterizes as "hostile," about her treatment of the department staff and negative feedback

---

[14] The statements of material fact do not give a date for this statement.  The plaintiff says in her memorandum of law that it occurred in 2006, Opposition at 10, and I use that date only to put the statement in the proper context.

[15] The defendant's request to strike this portion of paragraph 37 of the plaintiff's statement of material facts, Defendant's Responsive SMF ¶ 37, is denied.

[16] The plaintiff includes another incident in her memorandum, Opposition at 12-13, but the first sentence of her presentation is not supported by the paragraph of her statement of material facts to which she cites.  The defendant has asked that this, and the next two paragraphs of her statement of material facts to which the plaintiff cites as part of a continuing hostile work environment, be stricken because they are not supported by the citations given to the plaintiff's affidavit or there is "no . . . factual basis provided for this general statement."  Defendant's Responsive SMF ¶¶ 39-41.  Paragraph 20 of the plaintiff's affidavit, the authority cited for Paragraph 39 of her statement of material facts, does not support that paragraph, and the motion to strike it is therefore granted.  The same is true of Paragraphs 40 and 41, for which the same paragraph of the affidavit is cited as support, and those paragraphs are similarly stricken.  Without the factual allegations of these paragraphs, there is insufficient factual material to establish that any incident occurred.

surrounding her advising of students.  *Id.* ¶ 135.

Several of the foregoing incidents, or series of incidents, cannot be said to share the subject matter of the timely acts, the unsatisfactory scholarship rating by the department's Peer Review Committee that resulted in the plaintiff's failure to get a raise and the department chair's refusal of the plaintiff's request for a specific office.   There simply is no showing of a substantial relationship between the two timely acts and the incidents numbered 2, 4 and 9 above.  Indeed, number 2 is so generally stated as to be impossible to evaluate in terms of the *O'Rourke* tests.  In addition, item number 6 does not provide enough information to allow a reasonable factfinder to conclude that the plaintiff was treated differently from any other faculty member under the circumstances.

The remaining six items, given the benefit of reasonable inferences, simply appear to concern isolated and discrete acts, even when joined with the two timely acts.  They are not sufficiently alike to allow a reasonable factfinder to conclude that any particular act occurred with frequency, repetitively, or continuously over the approximately 13-year period involved. *See generally Barrow*, 144 Fed.Appx. at 57-58, 2005 WL 1926420 at **2-**3.  In addition, in order to constitute part of a serial violation that creates a hostile work environment, the individual discriminatory acts must "emanate[e] from the same discriminatory animus." *Provencher v. CVS Pharmacy*, 145 F.3d 5, 14 (1st Cir. 1998) (cited in *O'Rourke*).  The plaintiff has proffered no evidence that would allow a reasonable factfinder to conclude that items 4, 6-8, and 10 were based on sexual harassment or discrimination.  In this sense as well, no substantial relationship between these incidents and the two timely incidents has been shown.

The plaintiff has not established that the continuing violation doctrine applies to her hostile environment claims, and I will not consider the untimely incidents further.

### 2. *Substance of the Hostile Work Environment Claims*

The two timely incidents proffered by the plaintiff as evidence of the existence of a hostile work environment based on sexual harassment, denial of particular office space she requested and the rating of unsatisfactory for her scholarship in her post-tenure review, cannot establish the existence of a hostile work environment, however indulgently considered. Neither incident is sexually offensive on its face. The plaintiff offers evidence that Kivatisky, who has published less than she has, was rated satisfactory in scholarship, which would allow a reasonable inference, all else being equal, that her deficient rating was due to her gender. That evidence might apply to a gender discrimination claim, but it does not provide evidence of a hostile work environment. With respect to the office assignment, as best as I can determine, the requested office went to a junior female faculty member. The plaintiff offers Kivatisky's comment that, "given the continuing legal issues," he wanted to be sensitive to the climate in the department office in assigning office space, Opposition at 13, but that evidence goes to a retaliation claim, not a hostile environment claim.

In any event, the two timely incidents, considered together, cannot be interpreted to show that the plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *O'Rourke*, 235 F.3d at 728 (citation and internal punctuation omitted). That is the fourth element of the test for a hostile work environment claim set out in *O'Rourke*, and it cannot be established on the appropriately submitted evidence in the summary judgment record in this case.

The defendant is entitled to summary judgment on Counts I and II.

## B.  Counts III & IV

Counts III and IV of the second amended complaint allege gender discrimination in violation of Title VII and the Maine Human Rights Act.  Complaint ¶¶ 94-101.  The adverse employment action alleged as the basis for these counts is "the failure of the Defendant to provide the standard three and a half percent contract raise and a merit raise, based on the fact that she is a female."  *Id*. ¶¶ 96, 100; Opposition at 15-22.

In order to establish a *prima facie* case of gender discrimination, the plaintiff must show:

> (1) that she is a member of a protected class; (2) that she performed her job satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that she was treated differently from similarly situated men.

*Berry*, 525 F.Supp.2d at 228.  The defendant contends that the plaintiff cannot establish the second and fourth elements of this test.  Motion at 16-22.

With respect to the second element, the defendant contends that the plaintiff's demonstrated lack of scholarly productivity constituted unsatisfactory performance of her position.  Motion at 19.  The plaintiff's response skips over this element and proceeds directly to a consideration of whether the defendant's proffered reason for her failure to receive the raise is pretextual.  Opposition at 16.  The fact that a non-moving party does not address a necessary element of his or her claim in opposing summary judgment does not mean that summary judgment may be entered against that party, however.  The court must still consider whether that element of the claim may be established on the summary judgment record.  *Redman v. FDIC*, 794 F.Supp. 20, 21-22 (D. Me. 1992).

On this issue, the plaintiff has offered as evidence the assertion that, approximately a year after her post-tenure review resulted in a rating of unsatisfactory in the area of scholarship, the scholarship of a male professor, Kivatisky, who had published less frequently than the plaintiff,

31

was rated satisfactory as part of his post-tenure review by the department's Peer Review Committee. Plaintiff's SMF ¶¶ 1-3. Specifically, she asserts that "the Peer Review committee found . . . Professor Kivatisky's 'scholarship' was satisfactory." *Id*. ¶ 3. The defendant's "qualified" response to this paragraph, Defendant's Responsive SMF ¶ 3, cites to the same authority cited by the plaintiff in support of that paragraph, Exhibit 5 to the Deposition of Daniel Panici, Ph.D. (Attachment 3 to Plaintiff's SMF). That exhibit is a letter from the department faculty, signed by five people, including the plaintiff, to Dean Malhotra, reporting the results of the "committee's" post-tenure review of Kivatisky. After stating that "[t]he department considered the three areas of teaching, scholarship and service[,]" the letter says the following under the subheading "Scholarship":

> When considering scholarship, the committee noted that Russ has been on a 4-4 teaching load for the past two academic years and, therefore, sets up a non-scholarly track for evaluation. However, the committee was pleased to hear Russ speak about several research areas he is currently pursuing with passion. He spoke about his research interest in the areas of sustainability or Environmental Communication and public discourse on the Plum Creek Timber Company's attempt to develop land around Moosehead Lake. The committee encourages Russ to pursue those research interests.

*Id*. at [1]. The committee gave Kivatisky "an overall rating of SATISFACTORY," *id*. (emphasis in original), but clearly did not rate his scholarship as "satisfactory." On the contrary, it did not make any finding about his scholarship at all.

Given these facts, the plaintiff is not entitled to an inference that she performed her job satisfactorily, the second element of the *prima facie* case for gender discrimination. Nor can she establish that she and Kivatisky were "similarly situated," the fourth element of the *Berry* construct.

Accordingly, the defendant is entitled to summary judgment on Counts III and IV of the

second amended complaint.

## C.  Counts V and VI

Counts V and VI of the second amended complaint allege unlawful retaliation under federal and state law.  Complaint ¶¶ 102-111.  She alleges that she was subjected to adverse employment action after she filed "her complaint for sexual harassment," which adverse employment action is otherwise unspecified.  *Id.* ¶¶ 104, 109.  In her memorandum of law, the plaintiff clarifies that the "complaint" at issue is "her complaint with the EEOC and M[aine] H[uman] R[ights] C[ommission]" and the alleged adverse employment action is the denial of her request for a specific office in 2007.  Opposition at 22; Plaintiff's SMF ¶ 32.  She filed the EEOC/MHRC complaint on December 20, 2006.  Plaintiff's SMF ¶ 44.  She also contends that the unsatisfactory rating in scholarship given by the department's Peer Review Committee as part of her post-tenure review in April 2006 was an adverse employment action that was taken in retaliation for her "1990 EEO claim [against USM with the MHRC]."   Opposition at 23; Plaintiff's SMF ¶ 1; Defendant's SMF ¶¶ 48, 80; Plaintiff's Responsive SMF ¶¶ 48, 80.

To establish a *prima facie* case of unlawful retaliation under Title VII and the Maine Human Rights Act,[17] the plaintiff must show that (1) she engaged in protected conduct under the applicable statute, (2) she suffered an adverse employment action, and (3) the adverse action was causally connected to the protected activity.  *Fantini v. Salem State College*, 557 F.3d 22, 32 (1st Cir. 2009) (Title VII); *Bishop v. Bell Atlantic Corp.*, 299 F.3d 53, 58 (1st Cir. 2002) (Maine Human Rights Act).

There is no dispute that the plaintiff's filing of a complaint with the Maine Human Rights Commission in 1990 and her filing of a complaint with the same agency in December 2006,

---

[17] The same analytical framework applies to retaliation claims under Title VII and to claims brought under the Maine Human Rights Act.  *Higgins v. New Balance Athletic Shoes, Inc.*, 21 F.Supp.2d 66, 72 (D. Me. 1998), *rev'd on other grounds* 194 F.3d 252, 263 (1st Cir. 1999).

Defendant's SMF ¶¶ 48, 92; Plaintiff's Responsive SMF ¶¶ 48, 92, were protected activities under both the federal and the state statutory schemes.  The defendant does not challenge the plaintiff's assertion that the unsatisfactory rating for scholarship that resulted in the denial of a raise was an adverse employment action, Opposition at 23, but it incorporates by reference its earlier contention that the denial of the plaintiff's request for specific office space in 2007 may not be so characterized.[18]  Motion at 23 (incorporating by reference *id*. at 17-18).

I agree.  Denial of a request for specific office space does not rise to the level of an adverse employment action.  *See, e.g., Wanamaker v. Columbian Rope Co*., 108 F.3d 462, 466-67 (2d Cir. 1997) (denial of office and telephone, standing alone, not adverse employment action); *Morrison v. Potter*, 363 F.Supp.2d 586, 591 (S.D.N.Y. 2005) (loss of office, without more, never held to be adverse employment action); *Shah v. County of Los Angeles Dep't of Health Servs*., 2008 WL 2676533 (C.D.Cal. July 1, 2008), at *12 n.20 (denial of private office, phone, or computer not adverse employment action); *Hepburn v. City of Torrington*, 2004 WL 1771590 (D. Conn. Aug. 4, 2004), at *5 (involuntary move to smaller officer not adverse employment action). *See also Paquin v. MBNA Marketing Sys., Inc.*, 233 F.Supp.2d 58, 67 (D. Me. 2002) (assignment to new seat, which may have isolated plaintiff from co-workers, not actionable adverse employment action).  The defendant is entitled to summary judgment on any retaliation claim arising out of the denial of the plaintiff's request for office space in the building at 19 Chamberlain Street.

With respect to the retaliation claim based on the unsatisfactory scholarship rating in 2006, the defendant contends that the plaintiff "cannot establish any discriminatory or retaliatory intent by the Peer Review Committee or the decisionmaker, Dean Malhotra" and cannot establish

---

[18] Certainly the authority cited by the plaintiff for her assertion on this point, *Roberts v. United States Jaycees*, 468 U.S. 609 (1984) (a 31-page opinion to which the plaintiff gives no pinpoint citation), and *O'Rourke*, 235 F.3d at 730, Opposition at 23, provide no support for this contention.

a causal connection between her filing of a complaint, subsequently withdrawn, in 1990 and the scholarship rating 16 years later.  Motion at 23-25.  Because subjective intent is not a separate element of the *prima facie* case for retaliation, I will address only the issue of causal connection at this point.

The plaintiff argues only that "the simple passage of time is not enough to sever the causal chain," and asserts that this is "especially true when a Plaintiff is exposed to a hostile work environment."  Opposition at 23.  She quotes language from *O'Rourke* in support of the latter contention, but that language dealt only with the way in which a plaintiff can establish the existence of a hostile work environment over time, and did not suggest either (1) that this method is also to be used in establishing the existence of unlawful retaliation or (2) that the existence of a hostile work environment is sufficient to rebut an argument that a gap of 16 years between protected act and alleged retaliation severs any causal connection between the two.  *See O'Rourke*, 235 F.3d at 727.  Moreover, I have recommended herein that the court *not* "accept[] that the facts recited by the Plaintiff create a reasonable possibility of a hostile work environment," Opposition at 24, thus rendering moot the plaintiff's argument that, if a hostile environment exists, "the question of whether that environment creates the necessary nexus between the original filing and the unsatisfactory post-tenure review creates a material issue of fact."  *Id*.  Resolution of a question of law seldom, without more, creates a material issue of fact.

The passage of time between the protected action, in 1990, and the alleged retaliation, in 2006, is in fact a significant problem for the plaintiff with respect to her only remaining retaliation claim. The necessary causal link between these two events may be shown through means other than temporal proximity, *see Paquin*, 233 F.Supp.2d at 66 (for example, statistical evidence showing disparate treatment, comments by employer, changes in treatment of

employee, differential treatment in workplace), but the inference of a causal connection becomes more tenuous with the passage of time. *Dressler v. Daniel*, 315 F.3d 75, 80 (1st Cir. 2003) (two-year gap; citing cases in which summary judgment was granted when more than two years elapsed between protected conduct and alleged retaliation and in which nine-month period between the two "undermined" the inference of causation). Courts have uniformly found that gaps of 10 years or more between the protected action and the alleged retaliation negate any inference of retaliation. *E.g., Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007); *Marro v. Nicholson*, 2008 WL 699506 (E.D.N.Y. Mar. 12, 2008), at *11 (14 years).

A lack of temporal proximity alone may not always defeat a retaliation claim, but where, as here, the claim is unaccompanied by specific reference to any evidence of a causal connection other than the existence of a hostile work environment (a claim that I have already found not to be supported by the summary judgment record), entry of summary judgment for the defendant is appropriate.

### D.  Count VII

The final count of the second amended complaint alleges that either the defendant or USM, which is not a named party, "ha[ve] a policy or custom of minimizing or insufficiently investigating sexual harassment, sexual discrimination and retaliation complaints," Complaint ¶ 113; that one or both of them "ha[ve] failed to adequately train or supervise [their] EEO Officers," *id.* ¶ 114; and that as a result of the actions of one or both of them, the plaintiff's complaints were not adequately reviewed and investigated, *id.* ¶ 115.  Because USM is not a named defendant, I will consider this count as being asserted solely against the named defendant; after all, the count contains no allegation that the named defendant, UMS, is liable for the actions and inactions of USM.

This count is brought under 42 U.S.C. § 1983.  Complaint at [13].  As the defendant points out, Motion at 3, claims based on section 1983 may not be brought against it because it is considered part of the state for the purposes of section 1983 and accordingly is immune from such actions.  *Fantini*, 557 F.3d at 33.[19]  The plaintiff responds that "[i]n [her] original complaint, the individuals [the chancellor of the University of Maine System and the president of the University of Southern Maine] were sued in their official capacity.  Plaintiff modified that complaint at the University's request that the action be brought against the University of Maine System."  Opposition at 29.  She thus asks "[t]o the extent necessary" for leave to amend the complaint to add these two individuals as defendants in their official capacities.  *Id.*

The plaintiff's argument carries little weight.  Absent extraordinary circumstances, the tactical decisions made on behalf of a party, however instigated, cannot be laid at the feet of the opposing party.  In any event, leave to amend the complaint to add the chancellor and the president as individual defendants in their official capacities would be futile, because the gravamen of this count, according to the plaintiff, is that

> the University has failed to supervise the EEO Officer inasmuch[] as there is a pattern or practice of finding claims of discrimination unwarranted.  The Plaintiff points to her complaint and that of the Administrative Staff, both of which claimed a hostile environment premised in part by a male member of the faculty's discussion of sexuality and sex life.  Though the faculty member has admitted some of the comments[,] the University's EEO Officer has found the claims unwarranted.

*Id.* at 28.  This presentation is unaccompanied by any citation to the summary judgment record.

The only mention in the plaintiff's statement of material facts of a complaint that might have been filed with the USM EEO Officer is the following:  "Sherrie Kaminsky [not "the

---

[19] Contrary to the plaintiff's assertion, Opposition at 29, the *Lakshman* court did *not* consider "§1983 claims against the University of Maine and rule[] upon them without reference to the named officials acting in their official capacity."  The complaint in that action alleged causes of action under 42 U.S.C. § 1981, the Maine Human Rights Act, Title VII, and Title IX of the Education Amendment of 1972.  328 F.Supp.2d at 100.

Administrative Staff"] has also filed a formal complaint alleging that Professor West's comments created a hostile work environment."   Plaintiff's SMF ¶ 35.   There is no evidence in the summary judgment record, so far as I can tell, that the "University's EEO Officer" has found any of Ms. Kaminsky's claims "unwarranted."   In addition, the plaintiff's own statement of facts says only that West "does admit apologizing to Cathy Bourgeois."   Plaintiff's SMF ¶ 36.   This person is neither the plaintiff nor Kaminsky, and thus there is no evidence that West "has admitted some of the comments" he is alleged to have made in complaints filed by the plaintiff or Kaminsky.

Finally, the plaintiff's reference to "her complaint" presumably refers to the paragraph in her statement of material facts that alleges: "On October 31, 2006 . . . Kathleen Roberts, the University EEO Officer, told [her] that there was no evidence of a hostile work environment" and recommended that the plaintiff file an informal complaint "so that the Department members would not get upset with her."   Plaintiff's SMF ¶ 43.[20]   The plaintiff apparently suggests that at that point she could have filed a complaint with USM, contrary to Roberts' recommendation as the plaintiff reports it.[21]   But, that single instance cannot serve as evidence of a pattern or practice.   *See generally Jensen v. Frank*, 912 F.2d 517, 523 (1st Cir. 1990); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 819-21 (1985).

Leave to amend a complaint should not be granted where, as here, the proposed amendment would be futile, that is, that the complaint, as amended, would fail to state a claim upon which relief could be granted.   *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st

---

[20] The defendant's request to strike, Defendant's Responsive SMF ¶ 43,  the words "without conducting any sort of investigation" where the ellipsis appears in the text above, *see* Plaintiff's SMF ¶ 43, is granted for lack of foundation or personal knowledge.

[21] The evidence in the summary judgment record strongly suggests that the plaintiff spoke with Roberts in 2006, but chose not to file either a formal or an informal complaint.  Defendant's SMF ¶¶ 83, 88-92.  That is, the plaintiff chose not to avail herself of the procedures provided by the defendant to deal with such complaints.

Cir. 1996).  This rule is of particular force when the motion to amend is made only after a motion for summary judgment has been filed.  *Id*.

The defendant is entitled to summary judgment on Count VII.

### IV.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion for summary judgment be **GRANTED**.

### *<u>NOTICE</u>*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 23rd day of April, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge